IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**MARIE SMITH for**
**IDELLA SMITH, a minor,**

    **Plaintiff,**

vs.                                                          **CASE NO. 5:05cv6-RH/WCS**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

    **Defendant.**

    _____/

### REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D). It is recommended that the decision of the Commissioner be reversed and the application be remanded for further consideration and additional evidence.

**I.  Procedural status of the case**

Plaintiff, Marie Smith, on behalf of Idella Smith, a minor, applied for supplemental security income benefits. Plaintiff Idella Smith was 13 years old at the time of the administrative hearing. She alleges disability with respect to the functional domains of

(1) acquiring and using information and (2) attending and completing tasks. The Administrative Law Judge found the claimant has a "severe" impairment of speech and language delay, but found that this impairment did not meet or equal the listed impairments in subpart P, Appendix 1, of the Commissioner's Regulations. R. 15. He further found that the claimant did not have marked limitations in the two functional areas described above and was not entitled to supplemental security income benefits.

II.     **Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

A child's claim for supplemental security income benefits is analyzed by following the rules set forth in 20 C.F.R. § 416.924, et seq.  The Commissioner "will consider the combined effects of all [the child's] impairments upon [the child's] overall health and functioning," and is to evaluate "any limitations in [the child's] functioning that result from . . . symptoms, including pain."  20 C.F.R. § 416.924(a).  The claim is to be evaluated in three steps:

1. Is the child currently engaged in substantial gainful activity?

2. Does the child have any severe impairments?

3. Does the child have any severe impairments that meet, are medically equal to, or functionally equal in severity to, an impairment listed in Appendix 1 of 20 C.F.R. Part 404?

20 C.F.R. §§ 416.924(a)-(d).

The claim is denied at step two if the child does not have a severe impairment.  A "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" is not a "severe impairment."  20 C.F.R. § 416.924(c).

At step three, the issue of whether the impairment meets or equals a listed impairment is the same as for evaluation of an adult claim.  If the impairment neither meets nor equals a listed impairment, the Commissioner must next determine whether the impairment is functionally equal in severity to a listed impairment.  This step is unique to child supplemental security income disability claims.

As to functional equivalency, the regulations provide:

> If you have a severe impairment or combination of impairments that does not meet or medically equal any listing, we will decide whether it results in limitations that functionally equal the listings. By "functionally equal the listings," we mean that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section.

20 C.F.R. § 416.926a(a).

"[A] 'marked' limitation in a domain [will be found] when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). It "means a limitation that is 'more than moderate' but 'less than extreme.' " *Id*.

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii).

"[A]n 'extreme' limitation in a domain [will be found] when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

> If you are a child of any age (birth to the attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(3)(iii).

The Commissioner's regulations provide that test scores are not to be relied upon without considering other evidence, and "[n]o single piece of information taken in

isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." 20 C.F.R. § 416.926a(e)(4)(i). Test scores are considered "together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others." 20 C.F.R. § 416.926a(e)(4)(ii).

A child's level of functioning is assessed with respect to six "domains." The domains are:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and,

6. Health and physical well-being.

20 C.F.R. § 926a(b)(1)(i) – (vi).

To decide whether the claimant has a "marked" or an "extreme" limitation, the Commissioner:

> will consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects. We will consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§416.924a, 416.924b, and 416.929.

20 C.F.R. § 926a(e)(1)(i).

> The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g.,

percentiles) can be converted to standard deviations.  When you have such scores, we will consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.

20 C.F.R. § 926a(e)(1)(ii).

### III.    Analysis

Idella Smith was 11 years old when her mother applied for benefits, and was 13 years old when the Administrative Law Judge's decision was rendered.  At the time of the administrative hearing, she had completed seventh grade, had been provided language therapy, and was to be provided help with specific learning disabilities in the coming school year.  R. 87.

The claimant's mother testified at the administrative hearing that Plaintiff was to be in the eighth grade in the school year 2004-2005, but her teachers were going to continue her in all of her exceptional student education classes because she could not keep up with the other children.  R. 184.  Her mother testified that her child was forgetful and, when assigned tasks, did not complete them.  R. 186-188.  She said that her other children were better at completing work assignments.  R. 186.

On October 27, 2002, at the beginning of her sixth grade school year, Plaintiff's teacher, Janice Balentine, wrote:

> Idella Potter appears to be a happy 6th grader.  She earned a grade of 88/B in Language Arts and a grade of 85/B in Reading.  She reads very well out-loud and often volunteers to read.  She earned a grade of 83/B in Science during the first nine-week period.  In homeroom she is a member of the school safety committee, a position she asked for and requires her to relate concerns of her classmates to the committee and the decisions of the committee made must be told to the class.

R. 138. Ms. Balentine also said that while Plaintiff could not then complete multi-steps in tests, she thought it was because she did not do her homework and did not have time to practice. R. 133. She observed that Plaintiff would not ask questions, and seemed "terrified to get an answer wrong." *Id.* Ms. Balentine thought that Plaintiff perhaps did not complete her homework "as a result of her environment (lack of materials, time, or resources) not so much as a result of her disability." R. 132.

On January 29, 2003, midway through Plaintiff's sixth grade year, Amy Frederickson examined Plaintiff and completed a communication evaluation report. R. 163. Ms. Frederickson said that Plaintiff worked diligently on the tasks assigned, and "displayed age appropriate attention to the testing material." *Id.* She found her speech articulation to be within normal limits. R. 164. However, Ms. Frederickson found that Plaintiff's score on the receptive one-word picture vocabulary test was "significantly below average." *Id.* Ms. Frederickson said that "this suggests moderate to severe receptive language deficits." *Id.* She also found that Plaintiff had moderate to severe deficits in expressive language. *Id.* Ms. Frederickson concluded: "It is suspected that her academic and social development will be negatively affected by her deficits. It is recommended that Idella continue to be scheduled for formal speech and language therapy." *Id.*

On April 26, 2004, toward the end of Plaintiff's seventh grade year, the school psychologist, Pat Jackson, tested and examined Plaintiff and prepared a report. R. 75. Ms. Jackson stated that:

> [ Plaintiff's teachers] report that she demonstrates a short attention span, has difficulty understanding and following directions, and has trouble completing assignments and organizing work. She demonstrates poor

> memory, gives up easily, needs constant reassurance, and has trouble with verbal expression. She has a poor vocabulary and has difficulty with comprehension.

*Id.*

Ms. Jackson said that Plaintiff's word reading and reading comprehension scores were borderline and extremely low range. R. 76. She found that these scores exceeded only 5% and 2% of individuals her age. *Id.* Plaintiff's oral language and written language scores were also borderline, exceeding only 5% and 4% of students of her age. *Id.* Her math scores were a little better, but still borderline. *Id.*

Ms. Jackson administered the Woodcock-Johnson III tests of cognitive abilities, and found that with respect to "comprehension-knowledge" and "long-term retrieval," Plaintiff had "severe processing deficits" which were "significantly below expected level based on measured ability." R. 77. Ms. Jackson said in summary that Plaintiff had "significant academic deficits in reading, math reasoning, written expression, and listening comprehension." *Id.*

Ms. Jackson noted that Plaintiff's IQ scores were obtained in April, 2002, and said that Plaintiff's academics were generally commensurate with her measured ability. R. 75. Ms. Jackson meant that the correlation of academics with IQ had been "appropriate" in April, 2002, Plaintiff's fifth grade year.[1] Plaintiff's final grades for the seventh grade were B's in chorus and learning strategies, C's in language arts and math, and D's in science and world geography. R. 73-73. While Plaintiff had a grade of

---

[1] This is the way Dr. Koehnemann interpreted Ms. Jackson's comment. R. 178. Since Ms. Jackson found serious deficits in April, 2004, should could not have meant that she deemed Plaintiff's academics to be commensurate with her measured ability in April, 2004.

Case No. 5:05cv6-RH/WCS

96 at the beginning of that year in language arts, her grade slipped to 61 and 70 in the third and fourth quarters. R. 74. The grades were lower than the grades reported for early in the fifth grade year.

On May 17, 2004, at the end of Plaintiff's seventh grade year, Plaintiff's exceptional student education (ESE) evaluation team met and made its report. R. 86. The team consisted of two ESE teachers, a counselor, and the school psychologist. *Id*. This report confirmed the downward trend of Plaintiff's school performance that year. The team found that Plaintiff had a short attention span, and had difficulty understanding and following directions. *Id*. The team also found that Plaintiff had difficulty completing tasks and was below grade level in reading. *Id*. The team found that Plaintiff "has significant deficits in reading, math reasoning, written expression, and listening comprehension." *Id*. Finally, the team noted that there was a "split between her IQ, academic, and processing scores." *Id*. It was determined that in the coming year, eighth grade, Plaintiff would be removed to the "resource room" for more than 50% of the school day because this was the least restrictive environment. R. 82, 87.

A month later, on June 18, 2004, Plaintiff was evaluated by Neda Koehnemann, Ph.D. R. 178. Dr. Koehnemann noted that more than two years earlier, in April, 2002, when Plaintiff's IQ scores were obtained, "her academic performance was considered 'generally' commensurate with her measured ability." *Id*. Upon re-evaluation, however, with the Woodcock-Johnson III Test of Cognitive Abilities, Dr. Koehnemann said that Plaintiff's scores "indicate severe processing deficits, difficulty using previously learned experiences or procedures due to long-term memory retrieval problems." *Id*. Dr. Koehnemann said that Plaintiff had "marked impairment' in two of the Social Security

domains, acquiring and using information, and following, attending, and completing tasks. *Id*. She said that Plaintiff's score for one-on-one memory functioning on the Woodcock-Johnson was two standard deviations below the mean. *Id*. She noted that:

> [Plaintiff] continues to be functioning below grade level and has difficulty completing tasks with much reminding and encouragement needed. The split between her IQ, academics, and processing scores is so significant that it will impact her in all subject areas.

*Id*. With respect to Plaintiff's "marked impairment" in attending and completing tasks, Dr. Koehnemann said that:

> [h]er short attention span and memory in addition to her difficulty in understanding and being able to follow directions results in her having great difficulty attending and completing required assignments and activities. She requires constant reassurance and gives up easily. She also requires extended time and flexibility in completing coursework.

*Id*.

Dr. Koehnemann concluded with a diagnosis of two specific learning disabilities, reading disorder and disorder of written expression. R. 179. She found that Plaintiff fell two standard deviations below the mean in both areas. *Id*.

The Administrative Law Judge determined that Plaintiff has less than a marked limitation in the domains of acquiring and using information, and attending and completing tasks. R. 15-16. With regard to acquiring and using information, he rejected the conclusions of Dr. Koehnemann, noting that her evaluation "may be an overstatement of the claimant's limitations in this category." R. 15. He did not discuss Dr. Koehnemann's conclusion that Plaintiff suffers from marked limitation with respect to attending and completing tasks. As to the first, the ALJ reasoned:

> The claimant is in special education classes, but records from the school show that she is in the resource room only a little more than 40 percent of

> her school day and that the rest of the day was spent in a regular classroom setting. She does attend speech and language therapy for excessive/receptive delays and her full scale IQ was measured at 92, which is within the average range of intelligence. Information regarding the claimant's grades show that her academic performance was generally commensurate with her measured ability [IQ] and that she earns passing grades of C's and D's. Additionally, a former teacher of the claimant's noted that Idella was on the safety committee and that she had no difficulty relating the concerns of her classmates to the committee nor relating decisions of the committee to her classmates.

R. 15.

With respect to "attending and completing tasks," the Administrative Law Judge found that Plaintiff earned B's in language arts, reading, and science "last year at school." R. 16. He reasoned that these grades "could not have been accomplished if the claimant was not paying attention or completing tasks." He also reasoned that the testimony of Plaintiff's mother, that she did not complete household tasks without reminders, was "age appropriate behavior." *Id*.

In the memorandum in support of this decision, Defendant argues that additional evidence justifies the Administrative Law Judge's conclusions. Doc. 12, pp. 5-6. It was noted that Plaintiff's sixth grade teacher reported that she appeared to be happy in sixth grade, that she read very well out-loud, that she often volunteered to read, and was earning B's in language arts, reading, and science during a nine week period. *Id*. Her final grades for seventh grade year (2003-2004) were two B's, two C's, and two D's. *Id*. Also, in a "function report," Plaintiff's mother represented that Plaintiff could deliver telephone messages, repeat stories, tell jokes and riddles accurately, explain why she did something, use sentences with "because," "what if," and "should have been," read

and understand stories, write a simple story, understand money, and make correct change. *Id.*

The finding as to Plaintiff's IQ, is supported by substantial evidence in the record. R. 73-74, 159. Plaintiff's full scale IQ is 92 as measured in April, 2002. *Id.*

Further, Plaintiff's mother did provide a "function report" that listed positive findings in the areas described above. R. 110-111. This report of Plaintiff's functional abilities, which probably preceded the testimony, seems at odds with the testimony of Plaintiff's mother.

But the remainder of the Administrative Law Judge's reasoning is not supported by substantial evidence in the record. The missing element is consideration of the evidence in chronological order.

The most positive evidence is that from Ms. Balentine, but that came at the beginning of Plaintiff's sixth grade year. Ms. Balentine was then of the opinion that Plaintiff's problems might be a lack of home resources rather than disabilities. Plaintiff's grades in reading, language arts, and science were B's in October of that year. R. 138. But by January, 2003, Plaintiff was evaluated by Ms. Frederickson, and her report revealed that Plaintiff had moderate to severe receptive language and expressive language deficits. Ms. Frederickson concluded: "It is suspected that her academic and social development will be negatively affected by her deficits."

Plaintiff completed the next year, seventh grade, with B's in chorus and learning strategies, C's in language arts and math, and D's in science and world geography. R. 73-73. The grades from seventh grade reveal declining performance from the grades early in the sixth grade.

The Administrative Law Judge relied upon the statement by Ms. Jackson to find that Plaintiff's academic performance in the seventh grade was generally commensurate with her "measured ability."  But as noted above, Ms. Jackson was speaking of the correlation between Plaintiff's IQ and her grades in the fifth grade, not the seventh grade.

The ALJ determined that Plaintiff must have been capable of attending and completing tasks because she had B's in language arts, reading, and science.  But those grades were in October of the sixth grade year.  As noted above, Plaintiff's grades declined in seventh grade.  In addition to the declining grades, all of the recent testing (at the end of the seventh grade) demonstrates marked deficits in two functional domains, acquiring and using information, and attending and completing tasks.

On April 26, 2004, toward the end of the seventh grade year, the school psychologist, Pat Jackson, said that Plaintiff's teachers reported that Plaintiff had "a short attention span, has difficulty understanding and following directions, and has trouble completing assignments and organizing work."  Plaintiff's teachers further thought that Plaintiff had "poor memory, gives up easily, needs constant reassurance, and has trouble with verbal expression, and she had "a poor vocabulary and has difficulty with comprehension."  Ms. Jackson said that Plaintiff's word reading, oral language, and written language scores were borderline and her reading comprehension scores were extremely low range.  Ms. Jackson found that Plaintiff had "severe processing deficits" with regard to "comprehension-knowledge" and "long-term retrieval," and "significant academic deficits in reading, math reasoning, written expression, and listening comprehension."

These findings were then confirmed when the ESE team met to plan the exceptional educational services plan for Plaintiff for the eighth grade. The team was composed of four persons from the school, those who best could tell how Plaintiff had done in seventh grade, and included Ms. Jackson. They determined that in the next year she should be placed for more than 50% of the school day in a resource room, separate from other students (contrary to the Administrative Law Judge's finding that she would be in a special class 40% of the time). The team found that Plaintiff had a short attention span, had difficulty understanding and following directions, had difficulty completing tasks, was below grade level in reading, and "has significant deficits in reading, math reasoning, written expression, and listening comprehension." Finally, the team noted that there was a "split between her IQ, academic, and processing scores." *Id.* In other words, the processing problems Plaintiff had were not adequately reflected in her IQ score and academic scores.

This evidence was again confirmed by the testing by Dr. Koehnemann in June, 2004. Dr. Koehnemann found that Plaintiff had severe processing deficits, difficulty using previously learned experiences or procedures due to long-term memory retrieval problems. She found that Plaintiff had marked impairment in two of the Social Security domains, acquiring and using information, and following, attending, and completing tasks. She said that Plaintiff's score for one-on-one memory functioning on the Woodcock-Johnson was two standard deviations below the mean, which, according to the Commissioner's regulations, is significant evidence of a marked impairment. She said that Plaintiff was functioning below grade level and had difficulty completing tasks with much reminding and encouragement needed. She said that the split between her

IQ, academics, and processing scores is so significant that it will impact her in all subject areas.  With respect to attending and completing tasks, Dr. Koehnemann said that Plaintiff's short attention span and memory in addition to her difficulty in understanding and being able to follow directions results in her having great difficulty attending and completing required assignments and activities, and she requires constant reassurance and gives up easily.  Dr. Koehnemann provided a diagnosis of two specific learning disabilities, reading disorder and disorder of written expression, both of which she found to be two standard deviations below the mean.  Again, this is, by force of Defendant's regulations, significant evidence of marked limitations of function.

"A 'substantial evidence' standard . . . does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

Upon consideration of all of the evidence of record, it is concluded that the decision to deny benefits is not supported by substantial evidence in the record.  While in another case this would warrant a reversal of the Commissioner's decision and an

order that benefits be awarded, I am reluctant to recommend that here. Plaintiff is a child who is growing up. She seemed to have done her work without marked limitations in the fifth and sixth grades. She was described as happy in early sixth grade, and making good grades in the subjects that should have been most affected by her limitations. She has entered her teen age years, and it may be that her difficulties will resolve favorably as she matures. On the other hand, her eighth grade year may have proven more difficult for her than her seventh grade year, which would be additional, and perhaps conclusive, evidence that she indeed has two or more marked limitations of function that are expected to last more than one year. A remand would permit the Administrative Law Judge to acquire additional evidence as to her level of functioning, and would permit reconsideration of the evidence in chronological order, with an eye to determining whether Plaintiff's school performance has become increasingly impeded by her functional limitations.

Accordingly, it is **RECOMMENDED** that the Commissioner's decision to deny Plaintiff's application for benefits be **REVERSED** and the Court **REMAND** the application for further evidence and reconsideration consistent with this report and recommendation.

**IN CHAMBERS** at Tallahassee, Florida, on September 14, 2005.

> s/    William C. Sherrill, Jr.
> **WILLIAM C. SHERRILL, JR.**
> **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 5:05cv6-RH/WCS